UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

SARAH VARGAS,

                Plaintiff,

    vs.

CITY AND COUNTY OF HONOLULU,
DAVID OH, AND THAYNE COSTA,

            Defendants.

CIV. NO. 19-00116 LEK-WRP

**ORDER: DENYING DEFENDANT THAYNE COSTA'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING IN PART AND DENYING IN PART DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION FOR SUMMARY JUDGMENT**

        On January 29, 2020, Defendant Thayne Costa ("Costa") filed his Motion for Summary Judgment ("Costa Motion"), and Defendant City and County of Honolulu ("the City") filed its Motion for Summary Judgment ("City Motion"). [Dkt. nos. 100, 103.] Plaintiff Sarah Vargas ("Plaintiff") filed her memorandum in opposition to the City Motion ("City Opposition") and her memorandum in opposition to the Costa Motion ("Costa Opposition") on February 28, 2020. [Dkt. nos. 119, 121.] Costa and the City filed their respective reply memoranda on March 6, 2020. [Dkt. nos. 125, 128.] The Court finds these matters suitable for disposition without a hearing pursuant to Rule LR7.1(c) of the Local Rules of Practice for the United States District Court for the District of Hawaii. For the reasons set forth below, the Costa Motion is hereby denied, and the City

Motion is hereby granted in part and denied in part.
Specifically, the City Motion is granted as to Plaintiff's
negligent hiring and retention claims and Plaintiff's claims
against the City asserting vicarious liability for Oh's
intentional acts.  The City Motion is denied in all other
respects.

## BACKGROUND

Plaintiff filed this action on March 6, 2019.
[Complaint (dkt. no. 1).]  The operative pleading is Plaintiff's
First Amended Complaint ("Amended Complaint"), filed on July 15,
2019.  [Dkt. no. 38.]  The claims in this case arise out of an
incident in March 2017 in which Plaintiff alleges Defendant
David Oh, a Honolulu Police Department ("HPD") officer ("Oh"),[1]
sexually assaulted her during HPD's investigation into a
reported disturbance at Plaintiff's home.  See id. at ¶ 1.  The
Amended Complaint alleges the following claims: a 42 U.S.C.
§ 1983 claim against Oh and the City for violation of
Plaintiff's Fourteenth Amendment right to bodily integrity
("Count I"); a § 1983 claim against Oh and the City for

---

[1] Oh was served on February 1, 2020.  [Proof of Service,
filed 2/6/20 (dkt. no. 112).]  The Clerk's Office entered
default against Oh on March 10, 2020.  [Dkt. no. 137.]  On
March 20, 2020, Plaintiff filed a motion for default judgment,
[dkt. no. 143,] but the magistrate judge deemed the motion
withdrawn without prejudice because it was premature, in light
of Plaintiff's allegations regarding joint and several
liability.  [EO, filed 5/1/20 (dkt. no. 157).]

violation of Plaintiff's Fourth Amendment right to be free from
unreasonable searches and seizures ("Count II"); a 42 U.S.C.
§ 1985 conspiracy claim against all defendants ("Count III"); a
sexual assault claim against Oh and the City ("Count IV"); a
negligence claim against Costa and the City ("Count V"); a
negligent retention, hiring, training, and/or supervision claim
against the City ("Count VI"); a negligent infliction of
emotional distress ("NIED") claim against all defendants
("Count VII"); an intentional infliction of emotional distress
claim ("IIED") claim against Oh and the City ("Count VIII"); and
a claim against all defendants for violations of the Hawai`i
State Constitution ("Count IX").

        Count IX has been dismissed with prejudice. [Minute
Order, filed 12/2/19 (dkt. no. 81) ("12/2/19 Order"), at 3.]
The 12/2/19 Order also denied Costa's motion for judgment on the
pleadings as to his assertions of qualified immunity from the
§ 1985 claim and conditional privilege as to the state law
negligence claims against him.[2]  [Id. at 2.]  Costa and the City
have appealed the 12/2/19 Order, [Joint Notice of Appeal of
December 2, 2019 Minute Order, filed 12/4/19 (dkt. no. 83),] and
their appeal remains pending before the Ninth Circuit.  The

_____

        [2] Costa filed his motion for judgment on the pleadings on
November 14, 2019, and the City filed a joinder in the motion on
November 18, 2019.  [Dkt. nos. 62, 66.]

proceedings as to Count III have been stayed pending the outcome of the appeal, but the stay does not apply to the other claims in this case. [Minute Order, filed 1/14/20 (dkt. no. 98).]

I. **Evidence Relevant to the Costa Motion**

Many of the events on the days in question are not in dispute. On March 14, 2017, Plaintiff's friend, Jessica Reyes ("Reyes"), intended to stay overnight at Plaintiff's home. Plaintiff bought a large bottle of vodka for them to share, and Reyes made mixed drinks for them. [Concise statement of facts in supp. of Costa Motion ("Costa CSOF"), filed 1/29/20 (dkt. no. 101), at ¶¶ 1-4; Pltf.'s concise statement of facts in opp. to Costa Motion ("Pltf.'s Costa CSOF"), filed 2/28/20 (dkt. no. 122), at ¶¶ 1-4 (stating Costa's ¶¶ 1-4 are undisputed).] Plaintiff drank mixed drinks and vodka shots and became very intoxicated. Plaintiff and Reyes argued, and Plaintiff no longer wanted Reyes to stay at her home. [Costa CSOF at ¶¶ 5-8; Pltf.'s Costa CSOF at ¶¶ 5-8.]

Costa is an HPD corporal. [Costa CSOF, Decl. of Thayne Costa ("Costa Decl.") at ¶ 2.] On the night in question, Costa was working as a patrol officer, which included responding to 911 calls. [Id. at ¶ 9.] He was dispatched to the street where Plaintiff's home is located to respond to 911 calls indicating an argument between two women. [Costa Decl. at ¶ 9; Pltf.'s Costa CSOF, Decl. of K. Brian Mackintosh ("Mackintosh

4

Costa Decl.") at ¶ 6 & Exh. 3 (transcript of three 911 calls placed by Reyes).] During one of the calls, the female caller stated, "I flew in today and I was supposed to be staying somewhere and now she drank too much and has been punching me and her daughter in the face." [Mackintosh Decl., Exh. 3 at 5.] According to Costa, he was not acting as the supervisor of any officer on that night. [Costa Decl. at ¶ 9.] Plaintiff, however, argues Costa was the officer in charge during HPD's response at Plaintiff's home. See Pltf.'s Costa CSOF at ¶ 11.

The parties agree Costa arrived at Plaintiff's home at approximately 11:00 p.m. Plaintiff does not remember seeing or speaking to Costa on the night of March 14, 2017, nor does she remember speaking to any officer outside of her home. At the time, she did not know why the police officers came to her home. [Costa CSOF at ¶¶ 12-15; Pltf.'s Costa CSOF at ¶¶ 12-15.] Costa observed Plaintiff, Reyes, and Plaintiff's neighbor, Stacy Wheeler ("Wheeler"), in front of Plaintiff's home. Plaintiff and Reyes were arguing, and Wheeler was trying to stop them. Costa convinced Reyes to walk away from Plaintiff, and he requested a courtesy HPD transport to take Reyes to a hotel. A female HPD officer, Charly Sampaga ("Sampaga"), arrived and transported Reyes. [Costa CSOF at ¶¶ 17-21; Pltf.'s Costa CSOF at ¶¶ 17-21.] At some time prior to that point, Oh arrived at the scene. [Costa Decl. at ¶ 14.]

While he was assisting Reyes, Costa noticed Oh enter Plaintiff's home.  After Reyes was inside Sampaga's vehicle, Costa turned his attention to Plaintiff, who was yelling from inside her home.  Costa entered Plaintiff's home, and Plaintiff continued to raise her voice.  [Costa CSOF at ¶¶ 22-24; Pltf.'s Costa CSOF at ¶¶ 22-24.]  Although Costa warned Plaintiff to calm down and stop yelling, Plaintiff continued to yell. Plaintiff appeared to be louder and more emotional when she spoke to Costa, and she appeared to be calmer when she spoke to Oh.  [Costa CSOF at ¶¶ 26-27; Pltf.'s Costa CSOF at ¶¶ 26-27.] The parties agree Costa considered arresting Plaintiff, but Plaintiff emphasizes that Oh was also considering arresting her. [Costa CSOF at ¶ 28; Pltf.'s Costa CSOF at ¶ 28 (contesting Costa's ¶ 28, but only to add other facts).]  The parties agree Costa left Plaintiff's home, and Costa believed Oh succeeded in calming Plaintiff down because Costa did not hear further yelling or shouting from Plaintiff.  Costa later asked Oh over the HPD radio if the situation was okay, and Oh said it was. Costa saw Oh exit Plaintiff's home after being inside for approximately five to ten minutes.  [Costa CSOF at ¶¶ 34-36; Pltf.'s Costa CSOF at ¶¶ 34-36.]  The parties disagree about what transpired in the interim.

According to Costa, after he entered Plaintiff's home, he, Oh, and Plaintiff came back outside and spoke on her porch.

Oh said he could handle the situation, and he seemed to have a better rapport with Plaintiff than Costa did, so Costa left and went to his vehicle. [Costa Decl. at ¶ 17.] Costa "assum[ed] Oh would be able to convince [Plaintiff] to just calm down and sleep it off." [Id. at ¶¶ 17-18.] According to Costa, when he left Plaintiff's porch, Plaintiff "was fully covered with no private body parts . . . showing." [Id. at ¶ 18.] Plaintiff and Oh then went into Plaintiff's home. Costa denies knowing what happened between Oh and Plaintiff inside of Plaintiff's home, and he states he never talked with Oh about what happened inside of Plaintiff's home. [Id.]

At her deposition, Plaintiff testified that, on the evening in question, she was wearing a robe and was likely wearing nothing underneath it. [Mackintosh Costa Decl., Exh. 1 (excerpts of trans. of Pltf.'s 12/17/19 depo. ("Pltf. Depo. Trans.")) at 63-64.] The Federal Bureau of Investigation ("FBI") report of the incident also states Plaintiff was only wearing a robe when the police arrived. [Id., Exh. 4 (FBI report dated 5/31/17 ("FBI Report")) at 6 of 7.] Plaintiff presents evidence that Oh escorted her to her bedroom upstairs because he was trying to separate Costa and Plaintiff, who were "bickering at each other" and "going at it." [Sealed Documents, excerpts of trans. of 9/4/19 Honolulu Police Commission hrg. ("Police Commission Hrg. Trans."), filed 3/11/20 (dkt.

7

no. 139-1), at 19, 21-23; Mackintosh Costa Decl., Exh. 5 (trans. of 8/30/18 Predetermination Hrg. before HPD's Administrative Review Board regarding Oh ("ARB Hrg. Trans.")) at 10.] According to Oh, he believed Costa was still inside Plaintiff's home, at the base, or on the middle, of the stairs. [Police Commission Hrg. Trans. at 19, 25.] Plaintiff argues this is evidence that Costa was in her home when Oh took her to her bedroom. [Pltf.'s Costa CSOF at ¶ 33.]

At her deposition, Plaintiff testified she remembered Oh following her up the stairs and into her bedroom. Plaintiff heard Oh close the bedroom door. Plaintiff does not remember exactly what happened, except that Oh raped her. [Mackintosh Costa Decl., Exh. 1 ("Pltf. Depo. Trans.") at 95-97.] The defendants do not contest that Plaintiff and Oh had sexual relations, but Oh's and Costa's position appears to be that it was consensual. See, e.g., id., Exh. 5 (ARB Hrg. Trans.) at 10 (Oh testified that he "gave into her advances and succumbed to human weaknesses"); Costa CSOF at ¶ 48 ("Costa understands that engaging in consensual sex while an officer is supposed to be on duty is in violation of HPD policy.").

Costa did not know Oh until in January 2014, when Oh was assigned to the district that Costa was working in. They only interacted with each other while on duty. Costa never met Plaintiff before March 14, 2017. [Costa CSOF at ¶¶ 43-45;

Pltf.'s Costa CSOF at ¶¶ 43-45.]  The parties agree that, "[p]rior to hearing about the allegations made by Plaintiff against Oh after March 14, 2017, Costa did not see, hear, or know of any incident or allegation involving Oh harassing, assaulting, or acting inappropriately with another person, either sexually or otherwise."  [Costa CSOF at ¶ 40; Pltf.'s Costa CSOF at ¶ 40.]  Further, on the night in question, "[a]t no point in Costa's presence was Oh flirting, touching, coming on to Plaintiff, making inappropriate comments, violating Plaintiff's rights, or acting inappropriately towards her." [Costa CSOF at ¶ 38; Pltf.'s Costa CSOF at ¶ 38.]

> Costa states:
>
> At no point did I even suspect Oh was having, intended to have, or would have any type of sexual contact with Vargas.  Oh did nothing in my presence to suggest or indicate that he planned, intended, or was going to have sexual contact with Vargas.  I had absolutely no reason to believe that leaving Vargas would result in any type of sexual encounter between Vargas and Oh.

[Costa Decl. at ¶ 19.]  Plaintiff argues that, based on the inconsistencies in the evidence and the expert testimony she has submitted about "HPD's closed culture," this Court should reject Costa's testimony and "draw the logical conclusion . . . that Costa knew what transpired between Plaintiff and Oh."  [Pltf.'s Costa CSOF at ¶ 37; id., Decl. of Nicholas A. Sensley ("Sensley Costa Decl.") at ¶ 31 ("The Honolulu Police Department sustains

a culture and a custom that easily fosters sexual assault by police officers under the color of authority.  The police service culture is traditionally, for societal better or worse, a closed culture.").[3]  Further, Oh acknowledged that "it's not common practice" that he would try to de-escalate a conflict by taking a suspect, by himself, to her room so that she could go to sleep.  [Police Commission Hrg. Trans. at 25.]  Plaintiff argues that, under the circumstances of this case, it can be reasonably inferred that Costa knew Oh would sexually assault Plaintiff.  See Pltf.'s Costa CSOF at ¶¶ 39, 41.

## II.  **Additional Evidence Relevant to the City Motion**

The City and Plaintiff rely upon the facts asserted in relation to the Costa Motion to address the City Motion. [Concise statement of facts in supp. of City Motion ("City CSOF"), filed 1/29/20 (dkt. no. 104), at ¶ 15 (incorporating the Costa CSOF by reference); Pltf.'s concise statement of facts in

---

[3] Nicholas Sensley is a former Chief of Police in California, and since then,

he has served as a consultant and developer in the United States, Africa, Asia, Europe, South America and the South Caribbean.  He specializes in strategic planning and development, leadership development, the emphasis and practice of principled governance (ethics and anti-corruption) and countering human atrocities through the formation of collective impact teams.

[Sensley Costa Decl. at pg. 17 of 21 (page 1 of Sensley's Curriculum Vitae ("CV")).]

opp. to City Motion ("Pltf.'s City CSOF"), filed 2/28/20 (dkt. no. 120), at ¶ 15 (same as to Pltf.'s Costa CSOF).] Oh was accepted as a probationary HPD recruit in January 2013, and he participated in HPD's recruit training that year. He received a copy of HPD's Standards of Conduct and received training on the standards during recruit training. [City CSOF at ¶¶ 1-3, 6; Pltf.'s City CSOF at ¶¶ 1-3, 6.[4]] All HPD recruits go through training, including training on the Standards of Conduct. The 2013 new recruit training included a total of five hours of instruction on the Standards of Conduct. [City CSOF, Decl. of Clyde Ho ("Ho Decl.") at ¶¶ 5-6.[5]] The explanations of the Standards of Conduct provided during the 2013 recruit training included "examples provided so recruits understand the Standards of Conduct." [Id. at ¶ 6.a.]

The Standards of Conduct effective in January 2013 stated that HPD officers' responsibilities included:

1.   Knowledge of Laws and Regulations - Officers are
      expected to establish and maintain a working

---

[4] Plaintiff disputes the City's ¶ 3, but she only states "HPD's training is inadequate." [Pltf.'s City CSOF at ¶ 3.] She does not dispute that Oh underwent training on the Standards of Conduct.

[5] Clyde Ho is a current HPD Deputy Chief, and his duties include oversight of the HPD Training Division. Deputy Chief Ho was previously part of the training staff for HPD's academy. [Ho Decl. at ¶¶ 2-4.] Deputy Chief Ho taught the January 2013 new recruit class about the Standards of Conduct. [Id. at ¶ 6.]

knowledge of those ordinances of the City and County of Honolulu, statutes of the State of Hawaii, standards of conduct and procedures and orders of the department and elements thereof which are applicable to their functions as police officers.  In the event of improper actions or breaches of discipline, it will be presumed that the officers were familiar with the law, standard of conduct, procedure or order in question.

2.   <u>Obedience to Laws and Regulations</u> - Officers and civilian employees shall observe and obey all laws and ordinances and all rules, regulations, standards of conduct, and orders of the department, including any order of a superior or any order relayed from a superior by an employee of the same or lesser rank.

[City CSOF, Decl. of Lorna Eugenio ("Eugenio Decl.") at ¶ 4,[6] Exh. E (excerpts of Honolulu Police Department Policy - Organization, Management, and Administration - Standards of Conduct, dated 1/1/03, Policy Number 2.21) at 11.]  The current version, which has been in effect since December 1, 2016, contains virtually identical provisions.  [<u>Id.</u> at ¶ 3, Exh. D (excerpts of Honolulu Police Department Policy - Organization, Management, and Administration - Standards of Conduct, dated 12/1/16, Policy Number 2.21) at 11.]  It is undisputed that sexual assault is a crime under Hawai`i law.  [City CSOF at ¶ 10; Pltf.'s City CSOF at ¶ 10.]

---

[6] Lorna Eugenio is the Documents Clerk in the HPD Professional Standards Office, and her duties include serving as the Custodian of Records for past and current HPD policies. [Eugenio Decl. at ¶ 2.]

The parties also agree that the HPD Standards of Conduct prohibit officers from conducting personal business while they are on duty. [City CSOF at ¶ 8; Pltf.'s City CSOF at ¶ 8.] The City presents evidence that the 2013 recruit training on the Standards of Conduct included "[i]nstruction to the recruits that officers are prohibited from conducting personal business while on duty. Personal business includes, of course, engaging in any type of sexual act." [Ho Decl. at ¶ 6.d.] The City presents evidence that, as part of HPD's hiring process, Oh went through background checks, including a criminal history check, and he completed "a detailed questionnaire regarding his personal history, criminal history, educational background, and employment experiences." [City CSOF, Decl. of Raynor Ikehara ("Ikehara Decl.") at ¶ 4.b.[7]] According to Captain Ikehara, neither Oh's background checks nor any other information obtained about Oh during the hiring process "indicate[d] that Oh had engaged in criminal or sexually inappropriate behavior or that he had inclination for such behaviors." [Id.]

It is undisputed that, after its investigation into the incident at issue in this case, HPD terminated Oh's employment. [City CSOF at ¶ 13; Pltf.'s City CSOF at ¶ 13.]

---

[7] Raynor Ikehara is an HPD Captain, assigned to the City's Human Resources Division, which is the office that has custody of and maintains HPD officers' employment files. [Ikehara Decl. at ¶¶ 2-3.]

Plaintiff admits she has no evidence that the City negligently selected or retained Oh, but she contends that the City's training and supervision of Oh was negligent.  [City CSOF at ¶ 14; Pltf.'s City CSOF at ¶ 14.]

### III.  **The Motions**

The only claims against Costa that are currently before this Court – Counts V and VII - are negligence-based claims.  Costa contends there is no evidence to support these claims because: he owed no duty to Plaintiff; even if he owed a duty to Plaintiff, he did not breach that duty; and even if there is evidence that he breached a duty to Plaintiff, there is no evidence that the breach caused her damages.  Finally, Costa asserts he is shielded from liability for Plaintiff's negligence claims by conditional privilege.

The City contends Counts I and II are brought pursuant to Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978), and therefore Counts I and II fail because Plaintiff has not, and cannot, establish that the alleged violation of her constitutional rights was caused either by the City's failure to train its employee adequately or by a City custom or practice.  The City argues it is entitled to summary judgment as to Counts IV and VII because, under Hawai`i agency law, it cannot be held vicariously liable for Oh's

14

commission of sexual assault.[8]  As to Count V and the portion of Count VII based on Costa's actions, the City incorporates by reference the arguments in the Costa Motion and argues that, if Costa is not liable, the City cannot be held vicariously liable for Costa's actions.  Finally, the City asserts Plaintiff cannot establish the elements of Count VI, which asserts negligent hiring, retention, training, and/or supervision.

## DISCUSSION

### I.   Costa Motion

#### A.   Elements of Negligence-Based Claims

Both Count V and Count VII are premised upon the assertion that, but for Costa's actions and/or omissions, Costa could have prevented Oh from sexually assaulting Plaintiff.  See Amended Complaint at ¶¶ 142-43, 153.  Costa contends both claims fail because Plaintiff has not established the required elements of a negligence claim.  This Court has stated:

---

[8] The City asserts that, during Plaintiff's deposition, she represented that Count VIII is only being alleged against Oh. [Mem. in Supp. of City Motion at 2 n.1 (citing Costa CSOF, Decl. of Audrey L.E. Stanley ("Stanley Costa Decl."), at ¶ 2; Errata to Costa CSOF ("Costa CSOF Errata"), filed 1/29/20 (dkt. no. 102), Exh. A (Pltf. Depo. Trans.) at 217-18).]  According to Plaintiff, the representation made at her deposition was a misstatement by Plaintiff's counsel, in response to a question by Ms. Stanley.  [City Opp. at 36.]  Count VIII is clearly pled against both the City and Oh.  See Amended Complaint at pg. 30. Further briefing on Count VIII is not necessary because the City's arguments regarding Count IV and the portion of Count VII based on Oh's actions also apply to Count VIII.

A successful negligence claim must satisfy the following four elements: (1) a duty, or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks; (2) a failure on the actor's part to conform to the standard required; (3) a reasonably close causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of another.  Ono v. Applegate, 612 P.2d 533, 538 (Haw. 1980).

Lake v. Ohana Military Cmtys., LLC, CIV. NO. 16-00555 LEK, 2019 WL 4794536, at *20 (D. Hawai`i Sept. 30, 2019) (some citations omitted).  For a NIED claim, this district court has stated the elements are:

(1)  that the defendant engaged in negligent conduct;

(2)  that the plaintiff suffered serious emotional distress; and,

(3)  that such negligent conduct by the defendant was a legal cause of the serious emotional distress.

Kauhako v. State of Hawaii Bd. Of [sic] Ed., Civ. No. 13-00567 DKW-BMK, 2015 WL 5312359, *11 (D. Haw. Sept. 9, 2015).

An NIED claim is merely a negligence claim alleging a wholly psychic injury.  Duty and breach of duty are essential elements of an NIED claim and are analyzed utilizing ordinary negligence principles.  Kahoohanohano v. Dep't of Human Servs., 178 P.3d 538, 582 (Haw. 2008).

Ricks v. Matayoshi, CIV. NO. 16-00044 HG-KSC, 2017 WL 1025170, at *11 (D. Hawai`i Mar. 16, 2017), aff'd sub nom. Ricks v. Dep't of Educ., 752 F. App'x 518 (9th Cir. 2019).

1.   __Duty__

Costa first argues Plaintiff's negligence and NIED

claims fail because he did not owe a duty to her.  This district

court has stated:

> the general rule is that "[t]he failure of the
> police to provide protection [against harm from
> third parties] is ordinarily not actionable," __Ruf__
> __v. Honolulu Police Dep't__, 972 P.2d 1081, 1088
> (Haw. 1999) (quoting __Freitas v. City & Cty. of__
> __Honolulu__, 574 P.2d 529, 532 (1978)), unless there
> is some "special relationship" between the police
> officers (or the municipality) and the member of
> the public that was harmed.  __Id.__ at 1089.  But an
> exception to this rule exists "**where police**
> **action has increased the risk of harm** and there
> is negligence in providing protection against the
> enhanced danger." __Freitas__, 574 P.2d at 532
> (emphasis added); __Ruf__, 972 P.2d at 1088.  Put
> simply, police officers are under a "duty to
> avoid any affirmative acts which worsen the
> situation of the plaintiff." __Fochtman v.__
> __Honolulu Police & Fire Dep't__, 649 P.2d 1114, 1116
> (Haw. 1982).

__Ikeda v. City & Cty. of Honolulu__, Case No. 19-cv-00009-DKW-KJM,

2019 WL 4684455, at *8 (D. Hawai`i Sept. 25, 2019) (alterations

and emphasis in __Ikeda__).

The instant case presents more than a question of

whether Costa had a duty to act affirmatively to prevent harm to

Plaintiff.  __Cf.__ __Lee v. Corregedore__, 83 Hawai`i 154, 159, 925

P.2d 324, 329 (1996) ("The general rule is that a person does

not have a duty to act affirmatively to protect another person

from harm. 'The fact that the actor realizes or should realize

that action on his [or her] part is necessary for another's aid

17

or protection does not of itself impose upon him [or her] a duty to take such action.'" (alterations in Lee) (quoting Restatement (Second) of Torts § 314 (1965))).  The record shows that Costa and Oh went to Plaintiff's residence to respond to 911 calls, and, during her interaction with them, Plaintiff was intoxicated, agitated, and wearing little clothing.  According to Costa, he left Oh with Plaintiff and went to his vehicle. See supra Background § I.  For purposes of the instant motions, the record must be viewed in the light most favorable to Plaintiff, the nonmoving party, and all inferences must be drawn in Plaintiff's favor.  See S.R. Nehad v. Browder, 929 F.3d 1125, 1132 (9th Cir. 2019).  So construed, Oh's testimony before the Police Commission shows that Costa may have been in Plaintiff's home when Oh escorted Plaintiff to her bedroom.  See Police Commission Hrg. Trans. at 19, 25.[9]  Further, the evidence is clear that Plaintiff and Oh were alone in her bedroom.  See, e.g., Mackintosh Costa Decl., Exh. 1 (Pltf. Depo. Trans.) at 95-97.

---

[9] This Court cannot determine, on summary judgment, where Costa was at the time of the alleged sexual assault because doing so would require a credibility determination.  See Fuller v. Idaho Dep't of Corr., 865 F.3d 1154, 1161 (9th Cir. 2017) ("In assessing whether a genuine issue of material fact exists for trial, we do not weigh the evidence, nor make factual or credibility determinations." (citation omitted)).

The Court therefore concludes that, as a matter of law, Costa owed Plaintiff a duty not to engage in any affirmative acts that would worsen her situation.  See Haw. Motorsports Inv., Inc. v. Clayton Grp. Servs., Inc., 693 F. Supp. 2d 1192, 1196 (D. Hawai`i 2010) ("Whether a particular relationship gives rise to a duty is entirely a question of law." (citing Bidar v. Amfac, Inc., 66 Haw. 547, 552, 669 P.2d 154, 158 (1983))).  The Costa Motion is denied to the extent that Costa seeks summary judgment on the ground that he owed no duty to Plaintiff.

### 2.   **Breach**

Costa next argues that, even if he did owe Plaintiff a duty, he did not breach that duty.  Although whether a duty exists is a question of law for the court, "'what is reasonable and unreasonable and whether the defendant's conduct was reasonable in the circumstances are for the jury to decide.'" Yi v. Pleasant Travel Serv., Inc., Civil No. 10-00318 LEK-RLP, 2011 WL 4443625, at *15 (D. Hawai`i Sept. 22, 2011) (quoting Knodle v. Waikiki Gateway Hotel, Inc., 69 Haw. 376, 387, 742 P.2d 377, 384 (1987)).

In addition to the evidence regarding Plaintiff's attire and behavior during Oh and Costa's response to the 911 calls, Plaintiff has presented evidence that Oh and Costa did

not follow standard police procedure.  At Oh's ARB hearing, his

union representative stated:

> Basic police procedures should have been applied
> such as two officers being present when dealing
> with an intoxicated female subject.  Officer
> David Oh should not have placed himself to be
> alone in a room with an intoxicated female.  The
> incident that took place in Sarah Lee Vargas'
> bedroom could have been avoided.

[Mackintosh Costa Decl., Exh. 5 (ARB Hrg. Trans.) at 5 (emphases

omitted).]  Further, Oh testified before the Police Commission

that his escorting Plaintiff to her bedroom alone was "not

common practice."  [Police Commission Hrg. Trans. at 25.]

Mr. Sensley – Plaintiff's expert witness regarding law

enforcement operating procedures – also opines that: "in

consideration of the Plaintiff's reported behaviors, her

reported and officer observed reported [sic] of agitation, her

apparent unpredictability, and her reported and officer observed

level of intoxication, she should not have been left in the care

of a solo male officer"; [Sensley Costa Decl. at ¶ 17;] and

"[i]t is generally bad policy to allow male officers to be alone

and unmonitored with a female who is behaving uncontrollably and

not in full awareness and control of her decision-making

capacity," [id. at ¶ 21].  Further, Mr. Sensley opines that

Costa's radio call to Oh while Oh was in Plaintiff's home to ask

Oh "are you good?" indicates that Costa was aware that Oh being

alone with Plaintiff was a vulnerable situation.  [Id. at ¶ 20.]

Viewing the record in the light most favorable to Plaintiff, there are genuine issues of material fact as to whether Costa's conduct was reasonable under the circumstances.  See Fed. R. Civ. P. 56(a) (stating a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law").  The Costa Motion is therefore denied as to Costa's request for summary judgment on the ground that there was no breach of duty.

### 3.   Causation

Costa next argues that, even if he breached a duty that he owed to Plaintiff, her negligence-based claims fail because of a lack of causation.  This district court has stated:

> As explained by the Hawai`i Supreme Court in O'Grady [v. State], the law "does not hold a defendant liable for every possible result of his or her conduct."  [140 Hawai`i 36,] 44, 398 P.3d [625,] 633 [(2017)].  "[T]he causal sequence resulting from a single action could theoretically continue indefinitely and particular policy concerns weigh in favor of limiting liability under certain circumstances." Id.  Hawai`i state law thus requires "a plaintiff to prove that the defendant's conduct was the legal cause" of the plaintiff's injuries as one of the prima facie elements of negligence.  Id. at 43, 398 P.3d at 632.  "Legal cause" or proximate cause, as it is often referred, "refers to a cause that is legally sufficient to result in liability."  Id.
>
> Hawai`i courts apply the Mitchell test to determine whether a defendant's conduct is the legal cause of a plaintiff's harm.  Id. at 44,

21

398 P.3d at 633; <u>Mitchell v. Branch</u>, 45 Haw. 128, 132, 363 P.2d 969, 973 (1961). Under the <u>Mitchell</u> test, a defendant's conduct is the legal cause of a plaintiff's injuries if (1) the defendant's "conduct is a substantial factor in bringing about the harm," and (2) there is no rule of law relieving the defendant from liability because of the manner in which his or her negligence caused the harm. <u>O'Grady</u>, 140 Haw. at 44, 398 P.3d at 633 (citing <u>Taylor-Rice v. State</u>, 91 Haw. 60, 74, 979 P.2d 1086, 1100 (1999); <u>Mitchell</u>, 45 Haw. at 132, 363 P.2d at 973).

<u>Indymac Venture, LLC v. Leu Okuda & Doi</u>, CIVIL NO. 14-00263 KJM, 2018 WL 8303379, at *5 (D. Hawai`i Jan. 31, 2018) (some alterations in <u>Indymac</u>).

Viewing the current record in the light most favorable to Plaintiff, there are genuine issues of material fact regarding the issue of whether Costa's actions at Plaintiff's home were "a substantial factor in bringing about the harm" that Plaintiff's claims are based upon. <u>See</u> <u>O'Grady</u>, 140 Hawai`i at 44, 398 P.3d at 633. As to the second <u>Mitchell</u> factor, whether there is a "rule of law relieving the [defendant] from liability because of the manner in which his negligence has resulted in the harm," the only rule of law that may apply is the Hawai`i law conditional privilege, which will be addressed below. <u>See</u> <u>Mitchell</u>, 45 Haw. at 132, 363 P.2d at 973.

To the extent it seeks summary judgment in favor of Costa based on a lack of causation, the Costa Motion is denied.

B.  __Conditional Privilege__

Costa's final argument is that he is shielded from liability for his allegedly tortious actions because of the Hawai`i conditional privilege doctrine.  This Court has stated:

> Hawaii law provides that a nonjudicial government official has a qualified or conditional privilege with respect to his or her tortious actions taken in the performance of his or her public duty.  Towse v. State of Hawaii, 647 P.2d 696, 702 (Haw. 1982); Runnels v. Okamoto, 525 P.2d 1125, 1128 (Haw. 1974).  This privilege shields all but the most guilty nonjudicial officials from liability, but not from the imposition of a suit itself.  Towse, 647 P.2d at 702.  The privilege is the result of the Hawaii Supreme Court's balancing of competing interests.  It protects the innocent public servant's pocketbook, yet it allows an injured party to be heard.  See Medeiros v. Kondo, 522 P.2d 1269, 1272 (Haw. 1974).

> For a tort action to lie against a nonjudicial government official, the injured party must allege and demonstrate by clear and convincing proof that the official was motivated by malice and not by an otherwise proper purpose.  Towse, 647 P.2d at 702–03; Medeiros, 522 P.2d at 1272.  When a public official is motivated by malice, and not by an otherwise proper purpose, Hawaii law provides that the cloak of immunity is lost and the official must defend the suit the same as any other defendant.  Marshall v. Univ. of Haw., 821 P.2d 937, 946 (Haw. Ct. App. 1991), abrogated on other grounds by Hac v. Univ. of Haw., 73 P.3d 46 (Haw. 2003).

> The existence or absence of malice is generally a question for the jury.  Runnels, 525 P.2d at 1129.  However, when the existence or absence of malice is demonstrated to the court via uncontroverted

>       affidavits or depositions, the court may
>       rule on the existence or absence of malice
>       as a matter of law.  <u>See</u> <u>id.</u>
>
>       <u>Edenfield v. Estate of Willets</u>, Civ. No. 05-00418
>       SOM-BMK, 2006 WL 1041724, at *11-12 (D. Haw.
>       Apr. 14, 2006) (parallel citations omitted).
>
>       The Supreme Court of Hawai`i has held that
>       "the phrase 'malicious or improper purpose'
>       should be defined in its ordinary and usual
>       sense." <u>Awakuni v. Awana</u>, 165 P.3d 1027, 1042
>       (Haw. 2007).  In <u>Awakuni</u>, the Supreme Court
>       relied on *Black's Law Dictionary*, which defines
>       "malicious" as "'[s]ubstantially certain to cause
>       injury' and '[w]ithout just cause or excuse'";
>       and defines "malice" as "'[t]he intent, without
>       justification or excuse, to commit a wrongful
>       act[,]' 'reckless disregard of the law or of a
>       person's legal rights[,]' and '[i]ll will;
>       wickedness of heart.'" <u>Id.</u> (quoting *Black's Law
>       Dictionary* 976-77 (8th ed. 2004)).

<u>Begley v. Cty. of Kauai</u>, CIVIL 16-00350 LEK-KJM, 2018 WL
3638083, at *6 (D. Hawai`i July 31, 2018) (alterations in
<u>Begley</u>) (some citations omitted).  "Except in claims for
defamation, an actual malice standard applies as to all tort
claims." <u>Id.</u> (citation and internal quotation marks omitted).

In light of the undisputed facts concerning
Plaintiff's highly intoxicated and agitated state and the
disputed facts about where Costa was at the time of the alleged
sexual assault, there are genuine issues of material fact
regarding the question of whether Costa acted in "reckless
disregard of the law or of [Plaintiff's] legal rights." <u>See</u>
<u>Awakuni</u>, 115 Hawai`i at 141, 165 P.3d at 1042.  To the extent

that it seeks summary judgment in favor of Costa based on the

conditional privilege doctrine, the Costa Motion is denied.

## II.   **City Motion**

### A.   **Counts I and II (§ 1983 Claims)**

42 U.S.C. § 1983 states, in pertinent part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any
> State . . . , subjects, or causes to be
> subjected, any citizen of the United States or
> other person within the jurisdiction thereof to
> the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action
> at law, suit in equity, or other proper
> proceeding for redress . . . .

This district court has stated:

> A municipality is a "person" for purposes of
> § 1983 but it is "only when execution of a
> government's policy or custom inflicts the injury
> that the municipality as an entity is
> responsible." Long v. Cty. of Los Angeles, 442
> F.3d 1178, 1185 (9th Cir. 2006). "To impose
> liability on a local governmental entity for
> failing to act to preserve constitutional rights,
> a section 1983 plaintiff must establish: (1) that
> he possessed a constitutional right of which he
> was deprived; (2) that the municipality had a
> policy; (3) that this policy 'amounts to
> deliberate indifference' to the plaintiff's
> constitutional right; and (4) that the policy is
> the 'moving force behind the constitutional
> violation.'" Oviatt v. Pearce, 954 F.2d 1470,
> 1474 (9th Cir. 1992) (quoting City of Canton,
> Ohio v. Harris, 489 U.S. 378, 389-91, 109 S. Ct.
> 1197, 1205-06, 103 L. Ed. 2d 412 (1989)).[10]

---

[10] Canton was abrogated in part on other grounds by Farmer
v. Brennan, 511 U.S. 825 (1994). See, e.g., Miller v.

(. . . continued)

> This is referred to as a Monell claim for the
> Supreme Court case in which it was established.
> See Monell v. Dep't of Soc. Servs. of City of New
> York, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037, 56
> L. Ed. 2d 611 (1978).

Hollandsworth v. City & Cty. of Honolulu, Civ. No. 19-00587 ACK-

WRP, 2020 WL 913216, at *3 (D. Hawai`i Feb. 25, 2020).  The

first element is not contested in the City Motion.  See Mem. in

Supp. of City Motion at 3-10.

Plaintiff does not assert Oh acted pursuant to an

official City policy.  See City Opp. at 2-26.

> To establish Monell liability absent a
> formal government policy, a plaintiff "must show
> a longstanding practice or custom which
> constitutes the standard operating procedure of
> the local government entity." Trevino v. Gates,
> 99 F.3d 911, 918 (9th Cir. 1996) (internal
> quotation marks omitted) (citing Gillette v.
> Delmore, 979 F.2d 1342, 1346-47 (9th Cir. 1992),
> cert. denied, 510 U.S. 932, 114 S. Ct. 345, 126
> L. Ed. 2d 310 (1993)).  "The custom must be so
> 'persistent and widespread' that it constitutes a
> 'permanent and well-settled city policy.'"
> Trevino, 99 F.3d at 918 (citing Monell, 436 U.S.
> at 691, 98 S. Ct. 2018).

> A policy can be one of action or inaction,
> such as a failure to train employees when such
> omissions amount to the government's policy.
> Long, 442 F.3d at 1185-86 (9th Cir. 2006).  "[A]
> plaintiff may prove 'the existence of a custom or
> informal policy with evidence of repeated
> constitutional violations for which the errant
> municipal officials were not discharged or
> reprimanded.'"  Navarro v. Block, 72 F.3d 712,

---

Multonomah Cty., No. 3:11-cv-1168-AC, 2015 WL 3507949, at *13
(D. Or. June 3, 2015).

714 (9th Cir. 1995) (quoting <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1349 (9th Cir. 1992)).

<u>Hollandsworth</u>, 2020 WL 913216, at *8 (alteration in <u>Hollandsworth</u>).

### 1.   **Longstanding Practice or Custom**

Plaintiff asserts HPD "has a deeply embedded custom of violating the right to bodily integrity for vulnerable women in its care, custody, or control." [City Opp. at 15 (citation omitted).]   In support of her position, Plaintiff offers statements in:

-a declaration by Mr. Sensley; [Pltf.'s City CSOF, Decl. of Nicholas A. Sensley ("Sensley City Decl.");[11]

-a declaration by Plaintiff's expert witness, Dominique Roe-Sepowitz, M.S.W., Ph.D., Director of the Arizona State University Office of Sex Trafficking Intervention Research; [Pltf.'s City CSOF, Decl. of Dominique Roe-Sepowitz ("Roe-Sepowitz Decl.");]

-*Sex Trafficking in Hawai`i, The Stories of Survivors* (January 2019), a report co-authored by Dr. Roe-Sepowitz and Khara Jabola-Carolus, J.D., of the Hawai`i State Commission on the Status of Women ("Roe-Sepowitz/Jabola-Carolus Report"). [Roe-Sepowitz Decl., Exh. 1 (Roe-Sepowitz/Jabola-Carolus Report);[12]]

---

[11] The Sensley City Declaration is identical to the Sensley Costa Declaration, except that, in addition to Sensley's CV, two exhibits are attached to the Sensley City Declaration.  <u>See</u> Sensley City Decl. at pages 22 to 26 of 26.

[12] The Roe-Sepowitz/Jabola-Carolus Report is an executive summary which is also available at https://humanservices.hawaii.gov/wp-content/uploads/2019/01/Executive-Summary-Part-II-Sex-Trafficking-in-Hawaii-.pdf.

-a declaration by Plaintiff's expert, Katherine Marie Caldwell, M.S.W; [Pltf.'s City CSOF, Decl. of Katherine Marie Caldwell ("Caldwell Decl.");] and

-a declaration by an unidentified person ("Jane Doe") who "worked as a prostitute in the City and County of Honolulu," [Pltf.'s City CSOF, redacted declaration ("Doe Decl.")].[13]

The evidence that Plaintiff presents, construed in the light most favorable to her, raises serious concerns about the general law enforcement response to, and some officers' involvement in, the sex trafficking industry in the State of Hawai`i.  While these issues are troubling, they do not raise a genuine issue of fact for trial as to the issue of whether Oh's alleged sexual assault of Plaintiff was committed pursuant to a City policy.

Mr. Sensley discusses legislative testimony given by the captain of the HPD Narcotics/Vice Division and a City Deputy Prosecution Attorney in opposition to a bill that would have made it illegal for a police officer to engage in sexual intercourse during the course of a prostitution investigation.[14] [Sensley City Decl. at ¶ 10.]  Mr. Sensley criticizes this

_____

[13] An unredacted version of the Doe Declaration was filed on April 20, 2020 and served on defense counsel, [dkt. no. 152,] pursuant to a protective order issued by the magistrate judge on April 16, 2020, [dkt. no. 151].

[14] The written testimony by HPD Jason Kawabata, Captain of the HPD Narcotics/Vice Division, and the City's Department of the Prosecuting Attorney is Exhibits 5 and 6, respectively, to the Mackintosh City Declaration.

practice as unnecessary, and he asserts it "is generally considered unethical and contrary to the good order and discipline of investigating officers and the police department." [Id. at ¶ 11.]  Beyond the context of prostitution investigations, Mr. Sensley states:

> In the police officers' standards and training practice of every other state in the United States, nowhere is there to be found laws, policies, training, or toleration of police officers sexually engaging with persons while on duty or for any reasons or alleged necessities related to their duties as police officers.  In my experience with numerous police departments and police trainers and with police best practices experts worldwide, I have never encountered a professional who would regard on-duty sexual activity as acceptable.

[Id. at ¶ 12.]

Specific to HPD practices, Mr. Sensley describes speaking to "a small group of juvenile females in detention at the Hawaii Youth Correction Facility (HYCF)," some of whom, "if not all, were victims of sex trafficking and had been prostituted in Honolulu."[15]  [Id. at ¶ 26.]  Mr. Sensley states that, when he asked the girls what message they wanted him to convey to the HPD officers that he would be training regarding sex trafficking and juvenile prostitution, they all agreed that they wanted him to tell the officers "'to stop having sex with

_____

[15] Mr. Sensley's HYCF visit occurred on June 24, 2014. [Sensley City Decl. at ¶ 27.]

us!'" [Id. at ¶ 27.]  Mr. Sensley delivered their message when he conducted a training at the HPD academy on June 25, 2014, but the officers and supervisors present showed "little or no reaction." [Id. at ¶ 28.]  One officer, who Mr. Sensley does not identify, said: "'We're not surprised that's going on out there.'" [Id. at ¶ 29.]  The other officers present, who are also unidentified, "agreed with their colleague with nods of affirmation or through verbal affirmations." [Id.]  However, Mr. Sensley does not cite, nor does Plaintiff provide, any evidence indicating when the girls he spoke to at HYCF had their sexual encounters with HPD police officers.  Moreover, there is no evidence that Oh's presence at Plaintiff's home and his actions at her home were part of a sex trafficking or prostitution investigation.  It is undisputed that "Oh was never assigned to the narcotics/vice division, or the Crime Reduction Unit, at any time during his employment with HPD." [City CSOF at ¶ 12; Pltf.'s City CSOF at ¶ 12.]

Mr. Sensley argues statements by HPD Deputy Chief Jonathan Grems during Oh's Police Commission hearing are evidence that HPD "sustains a culture and a custom that easily fosters sexual assault by police officers under the color of authority." [Sensley City Decl. at ¶¶ 30-31.]  If true, this is extremely troubling.  However, Mr. Sensley's description of Deputy Chief Grems's statements will not be considered because

the transcript of Oh's Police Commission hearing was available
to Plaintiff, but she did not provide the portion of the
transcript with Deputy Chief Grems's statements.[16]   See Weil v.
Citizens Telcom Servs. Co., 922 F.3d 993, 998 (9th Cir. 2019)
("we may only consider admissible evidence when reviewing a
motion for summary judgment").

Mr. Sensley also asserts the fact that other HPD
officers wrote letters to support Oh and the fact that the State
of Hawaii Organization of Police Officers provided Oh with a
union representative to defend him constitute evidence that HPD
has a policy that permits officers to commit sexual assault
while on duty.  [Sensley City Decl. at ¶ 31.]  However,
Mr. Sensley also recognizes that, in most of the letters
supporting Oh, the letter writer did not know all of the
circumstances giving rise to the disciplinary action against Oh,
and other letter writers acknowledged that Oh made a mistake,
but argued he should be given another chance.  [Id. at ¶ 25.]
Further, Oh's union representative acknowledged that Oh should

---

[16] According to Mr. Sensley, Deputy Chief Grems stated he
would consider a police officer who has sex with a witness in
order to obtain information from the witness to be performing a
police officer's duty, even though the officer's actions would
be a violation of the Standards of Conduct.  [Sensley City Decl.
at ¶ 30.]  Even if the statement were considered, it is not
relevant to the instant case because there has been no evidence
suggesting that Oh engaged in sexual activity with Plaintiff in
order to obtain information from her.

disciplined, but argued that termination was not warranted.
[Mackintosh City Decl., Exh. 1 (ARB Hrg. Trans.) at 5 ("Officer
Oh is not perfect.  He did make a mistake.  Any discipline short
of termination would be fair and just." (emphasis omitted)).]
Neither Mr. Sensley's anecdotal evidence of young female
offenders being compelled to have sex with HPD officers nor his
interpretation of events during Oh's disciplinary proceedings
constitute evidence that, on the night in question, Oh acted
pursuant to an HPD custom or practice that was so widespread as
to constitute a City policy.

Dr. Roe-Sepowitz's research included "interviews for a
qualitative study on sex trafficking in Hawaii during the summer
of 2018," including "interviews on Oahu **and Hawaii Island** of 14
adult women who were sex trafficked and seven family members of
child sex trafficking victims." [Roe-Sepowitz Decl. at ¶ 8
(emphasis added).[17]]  Dr. Roe-Sepowitz states "law enforcement
was mentioned by the majority of the interviewees." [Id.]

> Repeated statements about law enforcement
> corruption in the form of buying sex from sex
> trafficking victims, notifying victims that there
> was to be a raid of prostitutes in exchange for
> sex, and reports that they took money from the
> sex traffickers were stated during the
> interviews.  These activities by law enforcement

---

[17] The participant statements described in the Roe-Sepowitz
Declaration are the same statements described in the Roe-
Sepowitz/Jabola-Carolus Report.  This Order will focus upon the
descriptions in the Roe-Sepowitz Declaration.

> on Oahu as reported by the research participants
> clearly meet the criteria for sexually
> victimizing vulnerable women.

[Id. at ¶ 10.]  Many of the statements that Dr. Roe-Sepowitz cites relate to: the failure to investigate sex trafficking; police officers who would "date" women in the sex trafficking industry; and police officers would pay for sex or had other unspecified involvement in the sex trafficking industry.  [Id. at ¶¶ 11, 12.a., 12.d, 12.h-k.]  These stories, while heart-breaking, are not relevant to the instant case because there was no sex trafficking investigation in this case, and there is no allegation that Oh was either dating Plaintiff or attempting to pay her for sex.

Other statements that Dr. Roe-Sepowitz cites are arguably relevant to this case.  One of the women interviewed reported that she would be allowed to leave after "stings where everyone else was arrested."  [Id. at ¶ 11.]  This appears to have occurred after she "'hooked up with cops regularly and sold sex to many of the officers doing the stings'."  See id.; see also id. at ¶ 12.b.  Dr. Roe-Sepowitz includes other quotes: "'I was in 7 or 8 stings and law enforcement would always let me go, I hooked up with lots of cops'"; [Roe-Sepowitz Decl. at ¶ 12.d;] and her customers, who "were high up" police officers "told [her] when the raids were going to happen," [id. at ¶ 12.f]. Dr. Roe-Sepowitz quotes another statement that police officers,

who were "either not informed about prostitution or they were corrupt," informed her before stings occurred. [Id. at ¶ 12.g.] It is unclear whether the quotes were from the same woman or different women and, if different women, how many women. It is also unclear whether the women were referring to HPD officers or police officers in the County of Hawai`i. One woman stated, "I got caught with drug possession and ended up in prison. The lead detective on my case turned off the video while being interrogated and offered not to file the charges if I slept with him. I declined and ended up in prison." [Id. at ¶ 12.c.] The allegations of the Amended Complaint suggest Oh conveyed to Plaintiff that, if she had sex with him, she would not be arrested. See Amended Complaint at ¶ 41 ("When Vargas went upstairs to go to bed, she felt a big presence behind her — Officer Oh. Officer Oh closed the bedroom door behind them. Officer Oh told her 'You're not going to jail.'"). However, Plaintiff has not presented admissible evidence to support this factual allegation. Therefore, Dr. Roe-Sepowitz's accounts of women who were coerced into trading sex in order to avoid arrest are not relevant to the instant case.

One woman cited in Dr. Roe-Sepowitz's study stated that, when she was fourteen years old, a police officer picked her up and raped her. He then held her at his house for a week, and four other officers came and had sex with her. [Roe-

Sepowitz Decl. at ¶ 12.e.]  The initial allegation is similar to Plaintiff's position that Oh raped her.  However, Plaintiff does not present any evidence indicating when the incident occurred. As unfortunate as this woman's ordeal was, it is not enough to raise a triable issue of fact as to the issue of whether Oh's alleged sexual assault of Plaintiff was committed pursuant to an HPD custom or practice that was so widespread so to constitute a City policy.

Plaintiff also presents the testimony of Ms. Caldwell, who states that, from August 2013 to May 2014, she performed her social work practicum at an Oahu facility that was "dedicated to the mission of empowering incarcerated women to successful transition from prison to the community."  [Caldwell Decl. at ¶ 7.]  Of the approximately thirty women housed at the facility, "roughly 10 had been sexually victimized by the Honolulu Police Department police officer arresting or investigating them." [Id. at ¶¶ 8-9.]  Ms. Caldwell does not specify when these incidents occurred, nor does she describe any similar incidents after May 2014.  There is also no evidence in the record suggesting that Oh was aware of such prior incidents at the times relevant to the instant case.  Thus, Ms. Caldwell's testimony is not enough to raise a triable issue of fact as to the issue of whether Oh's alleged sexual assault of Plaintiff

was committed pursuant to an HPD custom or practice that was so widespread so to constitute a City policy.

Jane Doe describes multiple incidents in which HPD officers paid her for sex. [Doe Decl. at ¶¶ 2.b-d.] She also describes one incident in which an HPD officer, who was wearing his uniform, told her "'I will take care of you if you take care of me.'" [Id. at ¶ 2.a.] Jane Doe agreed and "exchanged sex so that he would not arrest [her]." [Id.] Jane Doe does not state when these incidents occurred. Again, Jane Doe's experiences are troubling reports of extreme breach of trust by law enforcement, but they are not relevant to the instant case because they are factually dissimilar to the incident involving Plaintiff and Oh.

Although the individual accounts described in Plaintiff's evidence do not support her position, she argues they are collectively enough to raise a genuine issue of fact for trial. Plaintiff's position is summarized by Mr. Sensley's opinion that:

> Criminal sexual assault by police officers, either by the use of force naturally imbued in uniformed police presence or by acquiescence of a victim to the authority vested in a police officer, is a predictable outflow when on-duty sexual activity is generally practiced. HPD has sufficient allegations and sufficient sustained accounts of on-duty sexual misconduct by police officers to regard this as a significant problem that requires a significant organizational

36

response to breakdown and destroy a bad policing
custom and culture. . . .

[Sensley City Decl. at ¶ 32.]  As evidence of the allegedly

widespread sexual misconduct by HPD officers, Plaintiffs submit

the HPD Legislative Disciplinary Report for the Reporting Year

2017 ("HPD 2017 Disciplinary Report").  It reflects:

-one officer whose discharge for the commission of "criminal
    acts of a sexual nature against the victim" was overturned
    by an arbitrator because of an evidentiary issue;
    [Mackintosh City Decl., Exh. 4 (HPD 2017 Disciplinary
    Report) at 1;]

-one officer whose discharge for the commission of "multiple
    criminal acts of sexual assault against a relative who was
    a minor" was pending arbitration; [id. at 3;]

-one officer who was discharged for, inter alia, "[o]ffer[ing]
    to use police powers to help a female suspect in exchange
    for sexual favors"; [id. at 8;] and

-one officer who was discharged for making "unwanted sexual
    advances toward a female, including remarks and physical
    contact of a sexual nature" while off duty, [id. at 12].

While these incidents are terrible, they cannot be considered to

be so numerous as to constitute a pattern or common practice,

and all of the officers involved were discharged, although one

of the discharges was overturned.  The Court cannot conclude

that HPD's tolerance of sexual misconduct by police officers,

based on the record presented, is a "'persistent and widespread'

[custom] that . . . constitutes a 'permanent and well-settled

city policy.'"  See Trevino, 99 F.3d at 918 (quoting Monell v.

37

Dept. of Soc. Serv. of N.Y., 436 U.S. 658, 691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978)).

Even viewing the record in the light most favorable to Plaintiff, there is insufficient evidence in the record to support her position that HPD has a custom of sexually victimizing female suspects that is so widespread as to constitute a City policy for purposes of a Monell claim.[18] Plaintiff has therefore failed to show that there is a genuine issue of fact for trial as to the existence of a City policy allowing HPD officers to sexually victimize female suspects.

### 2.    Deliberate Indifference

Plaintiff also alleges Counts I and II must survive summary judgment because she will be able to prove at trial that the City had a policy of not training HPD officers not to impose unwanted sexual contact on suspects, and this policy constituted deliberate indifference to Plaintiff's constitutional right to bodily integrity.

Plaintiff has presented evidence that HPD is accredited through the Commission on Accreditation for Law Enforcement Agencies ("CALEA"), and § 1.12 of the CALEA

---

[18] This Court's ruling is limited to investigations outside of the sex trafficking context because the HPD response/investigation at Plaintiff's home was not a sex trafficking investigation.  This Court makes no findings or conclusions regarding the existence of any HPD or City practices or customs in the context of sex trafficking investigations.

Standards for Law Enforcement Agencies requires that all personnel receive ethics training at least twice a year. [Sensley City Decl. at ¶ 5.]  Mr. Sensley has reviewed Oh's employment records, which were provided to Plaintiff in discovery, and Oh's records indicate that he only received ethics training once a year.  <u>Id.</u> at ¶ 6; <u>accord</u> Ho Decl. at ¶ 5 ("HPD provides extensive training . . . to all its existing officers during **Annual** Recall Training as well as through various specialized training courses through the year." (emphasis added)).  Further, Mr. Sensley asserts there is no evidence showing the extent of the training Oh received. [Sensley City Decl. at ¶ 6.]

> Simply distributing policies and procedures on sexual assault to employees or even just posting them on a company's intranet site, is not enough to make them effective.  The goal of training is to make employees aware of the related issues most commonly experienced by policing professionals and give them the tools, not only to see sign of these issues, but also the tools or the knowledge required to effectively deal with them as they arise.  Performance training is generally regarded to be sufficient when the trainee demonstrates a grasp of the of the learning objectives through testing or by some demonstrated measure of comprehension.  The receipt of training materials alone does not constitute a training experience.

[<u>Id.</u> at ¶ 7.]

> Oh stated:
>
> it's important that the recruits and other officers are aware of the other things that they

> could get into trouble for.  Everyone knows about
> falsifying reports, evidence and of course use of
> force.  But the things that are just as important
> is squaring up your emotional and mental
> fortitude to avoid giving into some of the most
> basic human weaknesses.  The academy prepares you
> and teaches you about the ramifications of use of
> force, however nothing prepares you for what else
> can happen.  Nothing prepares you for the
> hardships of divorce or attention from women,
> which is why I was caught so off guard.

[Mackintosh City Decl., Exh. 1 (ARB Hrg. Trans.) at 10.]

Plaintiff argues it can be reasonably inferred from the record

that the City "provided Oh with no instruction as to how to deal

with vulnerable women in his care or custody." [City Opp. at

5.]

However, the parties agree that the HPD Standards of

Conduct prohibit officers from conducting personal business

while they are on duty.  [City CSOF at ¶ 8; Pltf.'s City CSOF at

¶ 8.]  The City has presented evidence that the recruit class

which Oh was a part of was instructed that officers cannot

conduct personal business, including sexual acts, while on duty.

[Ho Decl. at ¶ 6.d.]  Even construing the record in the light

most favorable to Plaintiff, the record shows that the City's

policy was to provide at least some training to HPD recruits

regarding the prohibition of engaging in any sex acts while on

duty.  Plaintiff must show that this policy constituted

deliberate indifference to her constitutional rights.

40

In the context of a <u>Monell</u> claim based on the failure to act, the Ninth Circuit has stated:

> Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." <u>[Bd. of Cty. Comm'rs of Bryan Cty. v.] Brown</u>, 520 U.S. [397,] 410, 117 S. Ct. 1382 [(1997)]. Deliberate indifference exists when the need "for more or different" action "is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." <u>City of Canton v. Harris</u>, 489 U.S. 378, 390 & n.10, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). A plaintiff can meet this standard in one of two ways. In some circumstances, the policy may be so facially deficient that any reasonable policymaker would recognize the need to take action. <u>Brown</u>, 520 U.S. at 409, 117 S. Ct. 1382. When that is the case, a plaintiff need point only to the policy itself to establish that the municipality's policymakers were on notice that the plaintiff's federally protected rights would likely be violated if they failed to act. <u>See</u> <u>id.</u> Alternatively, if the policy is not obviously, facially deficient, a plaintiff must ordinarily point to a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice. <u>Connick v. Thompson</u>, 563 U.S. 51, 62, 131 S. Ct. 1350, 179 L. Ed. 2d 417 (2011); <u>Clouthier v. County of Contra Costa</u>, 591 F.3d 1232, 1253 (9th Cir. 2010), *overruled on other grounds by* <u>Castro [v. Cty. of Los Angeles]</u>, 833 F.3d [1060,] 1070 [(9th Cir. 2016)].

<u>Park v. City & Cty. of Honolulu</u>, 952 F.3d 1136, 1141–42 (9th Cir. 2020) (some alterations in <u>Park</u>).

### a. __Facially Deficient Training Policy__

In <u>Brown</u>, the United States Supreme Court noted that it had previously left open "the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." 520 U.S. at 409 (citing <u>Canton v. Harris</u>, 489 U.S. 378, 390, and n.10 (1989)). The Supreme Court, however, stated this was limited to "a narrow range of circumstances" where

> a violation of federal rights may be a highly
> predictable consequence of a failure to equip law
> enforcement officers with specific tools to
> handle recurring situations.  The likelihood that
> the situation will recur and the predictability
> that an officer lacking specific tools to handle
> that situation will violate citizens' rights
> could justify a finding that policymakers'
> decision not to train the officer reflected
> "deliberate indifference" to the obvious
> consequence of the policymakers' choice — namely,
> a violation of a specific constitutional or
> statutory right.

<u>Id.</u> Training or supervision that was merely negligent is insufficient to support deliberately indifferent policy for purposes of a <u>Monell</u> claim. <u>Dougherty v. City of Covina</u>, 654 F.3d 892, 900 (9th Cir. 2011).

Plaintiff has raised genuine issues of material fact for trial that are relevant to the issue of whether the instant case falls within that narrow range of circumstances where

insufficient training constitutes deliberate indifference.
Based on the inherent nature of police work, it is likely that
HPD officers will be required to deal with intoxicated suspects,
including female suspects.  Further, it can reasonably be
inferred from the HPD 2017 Disciplinary Report that HPD was
aware that some of its officers were accused of, and some were
discharged for, sexual misconduct.[19]  Thus, there are triable
issues of material fact regarding the issue of whether an
officer engaging in consensual sex with a suspect or sexually
assaulting her was predictable, rendering HPD's failure to
provide more specific training regarding the prohibition of
on-duty sexual activity deliberate indifference.

###### b.   Pattern of Prior, Similar Violations

If a municipal policy is not facially deficient, the
plaintiff must show "a pattern of prior, similar violations of
federally protected rights, of which the relevant policymakers

---

[19] Because the 2017 Disciplinary Report appears to have been
compiled after the incident in question in this case, the report
itself could not have put the City on notice. However, based on
the reference numbers of the disciplinary actions described
therein, some of the disciplinary actions – or at least the
underlying conduct triggering the disciplinary action – occurred
prior to the incident at issue in this case. See Mackintosh
City Decl., Exh. 4 (2017 HPD Disciplinary Report) at 1, 3, 8.
HPD would have been aware of those incidents, and the internal
actions taken in response thereto, prior to the incident at
issue in this case.  For purposes of the City Motion, those
incidents and disciplinary actions support a reasonable
inference of knowledge.

had actual or constructive notice." Park, 952 F.3d at 1142

(citing Connick v. Thompson, 563 U.S. 51, 62, 131 S. Ct. 1350,

179 L. Ed. 2d 417 (2011)).  The triable issues of fact as to the

facial deficiency of HPD's training policy are sufficient to

avoid summary judgment.  However, the pattern of prior, similar

violations must be addressed, in the event that Plaintiff is

unable, ultimately, to prove that the training policy was

facially deficient.

In Connick, John Thompson brought a § 1983 action

against Harry Connick, the district attorney, alleging Connick

failed to adequately train the attorneys in his office regarding

their duty to disclose exculpatory evidence to the defense, and

this lack of training led to the failure to disclose exculpatory

evidence in Thompson's armed robbery case.  563 U.S. at 54.

Connick conceded that Brady v. Maryland, 373 U.S. 83 (1963), was

violated in Thompson's armed robbery case because one or more of

the prosecutors involved failed to disclose a crime laboratory

report to Thompson's defense attorney.  Connick, 563 U.S. at 59.

Although there were four other instances of convictions being

overturned because of Brady violations committed by attorneys in

Connick's office, the Supreme Court held that those instances

did not constitute the type of pattern of similar violations

necessary to establish deliberate indifference in the failure to

train.  Id. at 62.  The Supreme Court stated:

44

> Those four reversals could not have put Connick
> on notice that the office's Brady training was
> inadequate with respect to the sort of Brady
> violation at issue here.  None of those cases
> involved failure to disclose blood evidence, a
> crime lab report, or physical or scientific
> evidence of any kind.  Because those incidents
> are not similar to the violation at issue here,
> they could not have put Connick on notice that
> specific training was necessary to avoid this
> constitutional violation.

Id. at 62-63.

The majority of the evidence Plaintiff has presented,
see supra Discussion II.A.1, is not sufficiently similar to Oh's
conduct to have put the City on notice that specific training
was necessary to avoid the incident at issue in this case.  In
Connick, Thompson could not establish a pattern of prior,
similar violations by relying on any type of Brady violation;
violations that were factually similar to the violation in
Thompson's armed robbery case were required.  Similarly, in the
instant case, Plaintiff's evidence about other types of sexual
victimization of women by HPD officers, and other police
officers, are not sufficiently similar to Oh's conduct to
establish a pattern of prior, similar conduct.  Plaintiff has
only presented evidence of one women who reported that she was
raped by a police officer.  See Roe-Sepowitz Decl. at ¶ 12.e.
However, there is insufficient information about this incident
to conclude that it was part of a pattern of incidents prior to
Oh's conduct that was sufficient to place the City on notice

45

that HPD's training policies regarding on-duty sexual activity was inadequate.  The Court therefore concludes that Plaintiff has failed to raise a genuine issue of material fact for trial as to the existence of the type of "pattern of prior, similar violations" necessary to establish deliberate indifference without out a facially deficient policy.

### 3.   **Moving Force**

In order to prevail on her § 1983 claims, Plaintiff will have to establish that HPD's facially deficient training policy was "the moving force behind the constitutional violation" at issue in this case.  See Oviatt v. Pearce, 954 F.2d 1470, 1474 (9th Cir. 1992) (citation and internal quotation mars omitted).

> "For a policy to be the moving force behind the deprivation of a constitutional right, the identified deficiency in the policy must be closely related to the ultimate injury." Long [v. Cty. of Los Angeles], 442 F.3d [1178,] 1190 [(9th Cir. 2006)] (quotation marks omitted) (citing Gibson v. Cty. of Washoe, Nev., 290 F.3d 1175, 1196 (9th Cir. 2002), *overruled on other grounds by* Castro v. Cty. of Los Angeles, 833 F.3d 1060 (9th Cir. 2016)).  A plaintiff must establish that the injury would have been avoided if the proper policies had been implemented. Long, 442 F.3d at 1190 (citing Oviatt, 954 F.2d at 1478).

Hollandsworth v. City & Cty. of Honolulu, Civil No. 19-00587 ACK-WRP, 2020 WL 913216, at *9 (D. Hawai`i Feb. 25, 2020).  Viewing the record in the light most favorable to Plaintiff, in

46

particular, the evidence regarding HPD's failure to follow CALEA training standards and Oh's statements about HPD's failure to tell officers about how to deal with attention from women while on duty, the Court finds that there are genuine issues of material fact for trial regarding the issue of whether Plaintiff's injuries could have been avoided if HPD had sufficient training policies.

      **4.**   **Summary**

      Plaintiff has not presented enough evidence to raise a genuine issue of fact for trial as to the existence of: an HPD custom or practice of permitting the sexual victimization of female suspects that is so widespread as to constitute City policy; deliberate indifference in the prohibition of on-duty sexual activity because of a pattern of prior violations that are similar to the conduct at issue in this case. At trial, Plaintiff will not be permitted to rely on these theories to establish her § 1983 claims. However, Plaintiff has raised a genuine issue of fact for trial as to: the existence of deliberate indifference in the HPD training policy regarding the prohibition of on-duty sexual activity because the policy is facially deficient; and the issue of whether that policy was the moving force behind the alleged violation of Plaintiff's constitutional rights. The City Motion is therefore denied as to Counts I and II.

B.   __Vicarious Liability for Oh's Actions__

Plaintiff's claims against the City in Count IV, Count VIII, and the portion of Count VII based on Oh's actions assert the theory that the City is vicariously liable for Oh's tortious actions on the night in question.

> "Under Hawaii law, a municipality can have respondeat superior liability for torts maliciously committed by an employee acting within the scope of his authority." __McCormack v. City & Cty. of Honolulu__, 762 F. Supp. 2d 1246, 1253 (D. Haw. 2011).  The employee must be motivated by malice in his commission of the tort, and the plaintiff is required to allege malice in the complaint.  __Alexander v. City & Cty. of Honolulu__, 545 F. Supp. 2d 1122, 1136 (D. Haw. 2008).

__Hollandsworth__, 2020 WL 913216, at *11.  Hawai`i courts use the Restatement (Second) of Agency § 228 analysis to determine whether the employee's tortious actions were within the scope of his employment.  __See Hollandsworth__, 2020 WL 913216, at *12 (quoting __State v. Hoshijo ex rel. White__, 102 Hawai`i 307, 320, 76 P.3d 550, 563 (2003)).  Section 228 states:

> (1)  Conduct of a servant is within the scope of employment if, but only if:
>
> > (a)  it is of the kind he is employed to perform;
> >
> > (b)  it occurs substantially within the authorized time and space limits;
> >
> > (c)  it is actuated, at least in part, by a purpose to serve the master, and

> (d)  if force is intentionally used by the
> servant against another, the use of force is
> not unexpectable by the master.
>
> (2)  Conduct of a servant is not within the scope
> of employment if it is different in kind from
> that authorized, far beyond the authorized time
> or space limits, or too little actuated by a
> purpose to serve the master.

The § 228(1)(b) requirement is clearly met in this case because

it is undisputed that, at the time of the incident, Oh was on

duty and was at Plaintiff's home as part of HPD's response to

911 calls.  However, there is no evidence raising a genuine

issue of material fact as to the § 228(1)(a) requirement because

Oh was not employed to sexually assault, or even have to have

consensual sex with, women while on duty.

As to the § 228(1)(c) requirement, Plaintiff's own

expert witness indicates that Oh's presence in Plaintiff's

bedroom was not to serve the City's purposes.  See Sensley City

Decl. at ¶ 23 ("there was not a good-practices explanation, or

anything tactically reasoned as to why Officer Oh would need to

enter the room once the Plaintiff entered her room" (emphasis

omitted)), ¶ 24 ("There is no reliable training, or techniques,

good practices, or recommendations that a male police officer or

any police officer should escort a person directly to their bed

as a means of calming them.").  Oh himself has not claimed that

his actions in Plaintiff's bedroom served the City's purposes.

See, e.g., Mackintosh City Decl., Exh. 1 (ARB Hrg. Trans.) at 9

("On March 14th, 2017, I made the greatest mistake of my career. I understand that my actions were inappropriate and unprofessional."). According to Oh, at the time of the incident, he was going through a divorce, and he gave in to Plaintiff's sexual advances. [Id. at 10.] Plaintiff has not submitted any evidence which raises a genuine issue of material fact as to the issue of whether Oh's actions were motivated, "at least in part, by a purpose to serve" HPD and the City. See Restatement (Second) of Agency § 228(1)(c).

Because there are no triable issues of material fact as to the § 228(1)(a) and (c) requirements, the Court concludes that Plaintiff cannot carry her burden of proof as to those elements. Because the § 228(1)(a) and (c) requirements cannot be met, it is not necessary to address the § 228(1)(d) requirement. The City is entitled to a summary judgment ruling that it is not vicariously liable for Oh's alleged sexual assault of Plaintiff. Summary judgment is therefore granted in favor of the City as to Plaintiff's claims against the City in Count IV, Count VIII, and as to the portion of Count VII asserting a claim against the City based on Oh's actions.

C.    **Vicarious Liability for Costa's Actions**

The City's only argument regarding Count V and the portion of Count VII asserting that the City is liable for Costa's actions is that, if "Costa is not liable, the City is

50

also not liable." [Mem. in Supp. of City Motion at 14.]

Because the City Motion merely incorporates the Costa Motion by

reference, and the Costa Motion has been denied, the City Motion

must also be denied as to Plaintiff's claims based on the City's

vicarious liability for Costa's actions.

**D.  Negligent Hiring, Training, Supervision, and Retention**

Count VI alleges:

> 146. The City and County of Honolulu
> negligently selected, trained, retained, and/or
> supervised Officer Oh.

> 147. The City and County of Honolulu,
> through HPD, knew or should have known that
> Officer Oh, and/or the team of Officers Oh and
> Costa, posed a foreseeable risk to the citizens
> of Honolulu.

[Amended Complaint at pgs. 28-29.]  Plaintiff asserts Count VI

is based on the negligent training and supervision of both Oh

and Costa.  See, e.g., Costa Opp. at 15.

**1.  Hiring and Retention**

Plaintiff now states she does not allege negligent

hiring or retention under Count VI, but she asks that those

claims be dismissed without prejudice, pending further

discovery.  [Id. at 19 (emphasis omitted).]  This district court

has stated: "The burden initially falls on the moving party to

identify for the court those 'portions of the materials on file

that it believes demonstrate the absence of any genuine issue of

material fact.'"  Campbell v. Dep't of Human Servs., 384 F.

Supp. 3d 1209, 1216 (D. Hawai`i 2019) (quoting <u>T.W. Elec. Serv.,</u>
<u>Inc. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th
Cir. 1987)), *appeal filed*, (9th Cir. May 22, 2019).  Because the
City has carried its burden as to Plaintiff's claims for
negligent hiring and retention, Plaintiff "must set forth
specific facts showing that there is a genuine issue for trial."
<u>See</u> <u>id.</u> (citing <u>T.W. Elec. Serv.</u>, 809 F.2d at 630).  Plaintiff
has not met this burden as to those claims.  <u>See</u> City CSOF at
¶ 14 ("Plaintiff has no evidence that the City negligently
selected, trained, retained, and/or supervised Oh."); Pltf.'s
City CSOF at ¶ 14 (stating the City's ¶ 14 is: "Undisputed as to
selection and retention; Disputed as to training and
supervision").  Because Plaintiff has not met her burden, the
City is entitled to summary judgment as to Plaintiff's negligent
hiring claim and negligent retention claim.  The City Motion is
granted as to those portions of Count VI.

**2.   Whether Negligent Training is Distinct
        from Negligent Supervision/Control**

Although the Hawai`i Supreme Court has referred to
negligent training claims, <u>see, e.g.</u>, <u>Awakuni</u>, 115 Hawai`i at
145, 165 P.3d at 1046, this district court has observed that the
elements of the claim have not been clearly defined.  <u>See, e.g.</u>,
<u>Park v. City & Cty. of Honolulu</u>, 292 F. Supp. 3d 1080, 1102 n.14
(D. Hawai`i 2018).  To the extent the claim exists, this

district court has recognized that Hawai`i law requires proof "that the employer knew or should have known of the necessity and opportunity to train its employees regarding the specific conduct about which the plaintiff complains." Kaahu v. Randall, Civil No. 14-00266HG-RLP, 2018 WL 472996, at *18 (D. Hawai`i Jan. 18, 2018) (citing Otani v. City & Cnty. of Haw., 126 F. Supp. 2d 1299, 1308 (D. Haw. 1998), aff'd, 246 F.3d 675 (9th Cir. 2000)); see also Ryder v. Booth, Civil No. 16-00065 HG-KSC, 2016 WL 2745809, at *11 (D. Hawai`i May 11, 2016) (citing Otani for the proposition that Hawai`i law appears to require foreseeability as one of the elements of a negligent training claim).[20]

Some decisions from this district court have adopted the elements of a negligent supervision claim under California law. Kaahu, 2018 WL 472996, at *18 (citing Garcia ex rel. Marin v. Clovis Unified Sch. Dist., 627 F. Supp. 2d 1187, 1208 (E.D. Cal. 2009)); Ryder, 2016 WL 2745809, at *12 (same). However, other decisions "have placed claims for negligent training under the same standard as claims for negligent supervision." Ikeda v. City & Cty. of Honolulu, Case No. 19-cv-00009-DKW-KJM, 2019

---

[20] Otani stated: "Under Hawaii law, before a plaintiff can establish a claim for negligent training and/or supervision, the plaintiff must establish that "the employer knew or should have known of the necessity and opportunity for exercising such control." 126 F. Supp. 2d at 1308 (citing Abraham v. S.E. Onorato Garages, 50 Haw. 628, 639, 446 P.2d 821, 826 (1968)).

WL 4684455, at *11 n.10 (D. Hawai`i Sept. 25, 2019) (some
citations omitted) (citing Hyun Ju Park, 292 F. Supp. 3d at
1102; Otani v. City & Cty. of Haw., 126 F. Supp. 2d 1299, 1308
(D. Haw. 1998)).  Because of the lack of controlling Hawai`i
case law, this Court must predict whether the Hawai`i Supreme
Court would recognize a negligent training claim as a distinct
claim and, if so, what the elements of that claim are.  See
Trishan Air, Inc. v. Fed. Ins. Co., 635 F.3d 422, 427 (9th Cir.
2011).

        The Hawai`i Supreme Court case that most closely
addresses a negligent training claim, and that this district
court has cited in multiple cases addressing negligent training
claims, is Abraham, in which the supreme court stated:

>           The relationship of employer and employee
>     may, under certain circumstances, create a duty
>     on the employer to control the conduct of the
>     employee when the acts complained of are so
>     connected with the employment in time and place
>     as to give the employer a special opportunity to
>     control the employee.  Harper and Kime, the Duty
>     to Control the Conduct of Another, 43 Yale L.J.
>     886, 896 (1934).  It is essential for liability
>     that there be a showing by the plaintiff that the
>     employer knew or should have known of the
>     necessity and opportunity for exercising such
>     control.  Restatement (Second) of Torts s 317
>     (1965); S. Birch & Sons v. Martin, 17 Alaska 230,
>     244 F.2d 556, 561 (9th Cir. 1957).

50 Haw. at 633–34, 446 P.2d at 826.  Restatement (Second) of
Torts § 317 is titled "Duty of Master to Control Conduct of
Servant," and it states:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>
> > (a) the servant
> >
> > > (i)  is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
> > >
> > > (ii) is using a chattel of the master, and
> >
> > (b) the master
> >
> > > (i)  knows or has reason to know that he has the ability to control his servant, and
> > >
> > > (ii) knows or should know of the necessity and opportunity for exercising such control.

The Hawai`i Supreme Court has adopted § 317 to define the elements of a claim for negligent supervision or control.  <u>Dairy Rd. Partners v. Island Ins. Co.</u>, 92 Hawai`i 398, 426-27, 992 P.2d 93, 121-22 (2000); <u>Wong-Leong v. Hawaiian Indep. Refinery, Inc.</u>, 76 Hawai`i 433, 444, 879 P.2d 538, 549 (1994).

Restatement (Second) of Torts § 317 has been available since 1965, and the Hawai`i Supreme Court has cited it for the elements of a negligent supervision or control claim since at least 1994.  There has been ample opportunity for the supreme court to recognize a variation of § 317 as the definition of a

separate negligent training claim, or to adopt other elements entirely for the claim, but the supreme court has not done so. Further, appropriate training is undoubtedly one of the ways that an employer controls its employees.  This Court therefore predicts that the Hawai`i Supreme Court would decline to recognize a negligent training claim that is separate and distinct from a negligent supervision/control claim.  Instead, this Court predicts the supreme court would hold that negligent training is a type of negligent supervision/control.

The remaining portions of Plaintiff's Count VI will be addressed in that context.

### 3.    **Plaintiff's Negligent Training/Supervision Claim**

As previously stated, the elements of a claim for negligent supervision or failure to control are those set forth in Restatement (Second) of Torts § 317.  The Hawai`i Supreme Court has made it clear that "negligent supervision may only be found where an employee is acting **outside** of the scope of his or her employment." Pulawa v. GTE Hawaiian Tel, 112 Hawai`i 3, 18, 143 P.3d 1205, 1220 (2006) (emphasis in Pulawa) (quotation marks and citation omitted).

For the reasons previously stated, the Court concludes, for purposes of the City Motion, that Oh was acting outside the scope of his employment during the period when he was in Plaintiff's bedroom.  Whether Costa was acting outside

the scope of his employment at that time is a closer question. The parties agree that Costa left Oh alone with Plaintiff, although there is some dispute about exactly where Costa was. See supra Background § I.  Mr. Sensley opines that "Costa did not have the privilege of being able to pacify animus by abandoning the Plaintiff to Officer Oh because Officer Costa was either frustrated, angered, biased, or otherwise emotionally perturbed because of how he adjudged the Plaintiff's attitude or behavior."  [Sensley City Decl. at ¶ 20 (emphasis omitted).] Viewing the record as a whole in the light most favorable to Plaintiff, there are genuine issues of material fact which are relevant to the question of whether Costa was acting outside the scope of his employment when he left Plaintiff alone with Oh.

It is undisputed that Oh and Costa were at Plaintiff's home in their capacity as HPD employees, and it is clear that the City, through HPD, had the ability to control Oh and Costa. See Restatement (Second) of Torts § 317(a)(i), (b)(i).  There is evidence in the record that it is standard police practice, including HPD practice, to have two officers present when an officer is dealing with a person in a condition similar to Plaintiff's condition on the night in question.  See supra Discussion § I.A.2.  This indicates that the City, through HPD, knew of the necessity and opportunity to control police officers in such situations.  See Restatement (Second) of Torts

§ 317(b)(ii).  The Court therefore concludes, for purposes of the City Motion, that the City had a duty to exercise reasonable care to control Oh and Costa in order to prevent each of them "from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them."  See id. § 317.

Based on the evidence described *supra* Discussion § II.A.2, this Court finds that there are a genuine issues of fact for trial regarding whether HPD's failure to provide more ethics training, including more specific training, to its officers was negligent.  In light of this dispute and the disputed issues of fact previously discussed in this Order, this Court also finds that there are triable issues of fact relevant to the issue of whether the City exercised reasonable care in its control of Oh and Costa.  The City Motion is therefore denied as to the remaining portions of Count VI.

## CONCLUSION

On the basis of the foregoing, Costa's Motion for Summary Judgment, filed January 29, 2020, is HEREBY DENIED in its entirety, and the City's Motion for Summary Judgment, filed January 29, 2020, is HEREBY GRANTED IN PART AND DENIED IN PART.  Specifically, the City Motion is GRANTED as to Plaintiff's claims against the City in Count IV, Count VIII, the portions of Count VI alleging negligent hiring and retention, and the

portion of Count VII asserting the City is liable for Oh's actions.   The City Motion is DENIED in all other respects.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAI`I, June 30, 2020.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

SARAH VARGAS VS. CITY AND COUNTY OF HONOLULU, ET AL; CV 19-00116 LEK-WRP; ORDER:  DENYING DEFENDANT THAYNE COSTA'S MOTION FOR SUMMARY JUDGMENT; AND GRANTING IN PART AND DENYING IN PART DEFENDANT CITY AND COUNTY OF HONOLULU'S MOTION FOR SUMMARY JUDGMENT